# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

FEDERAL NATIONAL MORTGAGE )
ASSOCIATION, )
           )
          **Appellant,** )
           )
**v.** )                **No. 12-2163-STA-tmp**
           )
**VILLAGE GREEN I, GP,** )
**A Nevada General Partnership,** )
           )
          **Appellee.** )

---

## OPINION

---

Appellant Federal National Mortgage Association ("Fannie Mae") appeals the decision of the United States Bankruptcy Court for the Western District of Tennessee, confirming the Fifth Amended Plan of Reorganization and Supplemental Amendment proposed by Appellee Village Green I, GP ("Village Green"), the Debtor in the bankruptcy proceeding. For the reasons set forth below, the decision of the Bankruptcy Court is **AFFIRMED IN PART, REVERSED AND REMANDED IN PART**.

## BACKGROUND

**I. Factual Background**

The Bankruptcy Court set out the following background facts in its confirmation order, which neither party has challenged on appeal. (R. 137-40.) Village Green is the owner of the Village Green Apartments located at 3450 Fescue Lane, Memphis, Tennessee ("the property"). The property is a 314-unit apartment complex situated in the Hickory Hill neighborhood of

1

Memphis. Village Green purchased the property in December 2005 for $10,820,000.00. The previous owner had purchased the property in 2003. The original maturity date on the note was October 1, 2013; however, the note was payable at a thirty-year amortization rate. The unpaid principal balance accrued interest at a rate of 5.98% per annum. Principal and interest were paid at $55,040.41 per month plus a monthly replacement reserve payment of $7,195.83 and an additional amount for the monthly escrow of taxes and insurance. The total monthly payment owed to Fannie Mae was $85,471.85.

At closing, Village Green's equity holders provided $2,140,437.59 of capital along with $8,964,818.04 of assumed debt owed to Fannie Mae. At the time of the purchase, Village Green executed an Assumption and Release Agreement with the prior owner of the property whereby Village Green assumed all of the obligations of the prior owner as set forth in the Multifamily Note, as secured by the Multifamily Deed of Trust, Assignment of Rents and Security Agreement. Village Green further assumed the Replacement Reserve and Security Agreement, the Assignment of Management Agreement, the Operations and Maintenance Agreement, and the Completion Repair and Security Agreement.

Thereafter, Village Green executed a Master Lease with EP Village Green Operator, LLC ("EP Operator"), pursuant to which EP Operator collected all rent, paid all bills and remitted a basic rent to Village Green. Subsequent to the execution of the Master Lease, EP Operator retained Lexington Asset Management, LLC to manage the property.

At the confirmation hearing, Eric Clauson, the Member Manager of Village Green, testified that Village Green had begun experiencing financial difficulties in 2009. These problems coincided with the broader economic downturn affecting the United States at large. The poor economy resulted in a disproportionately high unemployment rate in the Memphis area,

specifically among African-Americans who make up the majority of the tenants at the property. Village Green's tenants started to lose their jobs, resulting in failures to pay rent, evictions, and a high rate of tenant turnover at the property. Village Green concluded that under the circumstances, its losses at the property were beyond its control. At that time Village Green approached the loan servicer seeking a modification of the financing for the property. The loan servicer indicated that Fannie Mae would not discuss modification of a loan so long as it was current and that Village Green would need to miss a payment in order to be classified as "special servicing." Village Green did not make its December 2009 payment.

Clauson testified that following Village Green's missed payment, Fannie Mae sent Village Green a "pre-negotiation" letter and requested certain documentation. Fannie Mae did not, however, engage in any dialog with Village Green or otherwise attempt a loan modification. Fannie Mae only stated the amount owed to bring the loan current and gave notice of its intent to conduct foreclosure proceedings. Fannie Mae also accused Village Green of failing to maintain the property, though there is no evidence that Fannie Mae ever performed an inspection of the property.

## II.  Procedural History

In due course Fannie Mae filed suit in the Chancery Court for Shelby County, Tennessee, seeking appointment of a receiver. Ultimately, the Chancery Court denied Fannie Mae's request, at which time Fannie Mae initiated foreclosure. Village Green filed its Chapter 11 case on April 16, 2010, to halt the foreclosure proceedings. Clauson testified that Village Green made substantial pre-petition, post-default payments to Fannie Mae, constituting the escrow for taxes and insurance, partial payment of the replacement reserve escrow, and partial payment of principal and interest.

Village Green's Fifth Amended Plan of Reorganization as modified by the Supplemental Amendment to its Fifth Amended Plan of Reorganization, classified Fannie Mae's secured claim in one class and provided for two separate classes of unsecured claims. Class 3 consisted of general unsecured claims which would be paid in two equal installments. The first installment would be due thirty (30) days from the plan's effective date and the second installment sixty (60) days after the plan's effective date. According to Fannie Mae, the creditors making up Class 3 are Village Green's accountant whose unsecured claim is $742.50 and a former attorney for Village Green whose unsecured claim is $1,629.97.

Class 4 consisted of Fannie Mae's unsecured deficiency claim. Pursuant to the Supplemental Amendment to the Fifth Amended Plan of Reorganization, Fannie Mae's unsecured deficiency claim was calculated as the difference between Fannie Mae's total allowed claim, which Village Green estimated to be $8,600,000.00, less the amount of Fannie Mae's allowed secured claim, which the parties stipulated to be $5,400,000.00 (i.e. the current value of the property) and less payments made to Fannie Mae after the commencement of the bankruptcy proceeding. Village Green proposed, and the Bankruptcy Court confirmed, the following treatment of Fannie Mae's unsecured claim:

> Fannie Mae will receive deferred cash payments equal to the full amount of its Allowed unsecured deficiency claim at a market rate of interest of 5.4% per annum from and after the Effective Date. Commencing on or before the 10th of each month beginning after the Effective Date, Debtor will make monthly payments of $2,000 to Fannie Mae for twelve months.

> The monthly payment of $2,000 will be applied to the interest accruing on Fannie Mae's unsecured deficiency claim. After the initial twelve month period, Debtor will make full interest payments on Fannie Mae's Allowed unsecured deficiency claim. Payments to FNMA [sic] will continue for a total of one hundred and twenty (120) months after the Effective Date. The remaining balance due to Fannie Mae, including any accrued unpaid interest, will be paid in full upon the refinancing of the real property, otherwise known as Village Green Apartments,

which Debtor believes will be obtainable on or before the expiration of the 120 month period.

In short, the Plan provided for a balloon payment of approximately $6.64 million at the conclusion of the ten-year repayment period for Fannie Mae's unsecured claim.

The Court would add that under the plan Class 2 consisted only of Fannie Mae's secured claim in the amount of $5,400,000.00, a sum to which the parties agreed by stipulation. The plan proposed to pay Fannie Mae deferred cash payments at an interest rate of 5.4% per annum in equal monthly installments for a term of one hundred and twenty (120) months. The monthly installments were calculated based on an amortization period of thirty years from the effective date of the plan. The plan anticipated a balloon payment obtained through refinancing at the conclusion of the ten-year repayment period. The plan further provided that Village Green would independently escrow funds allocated for the property's taxes, insurance, and capital expenditures, as opposed to Fannie Mae impounding the funds. Village Green was required to provide a quarterly accounting of these funds and an operating report to Fannie Mae.

The Bankruptcy Court confirmed Village Green's Fifth Amended Plan and Supplemental Amendment, concluding that the Plan satisfied the cramdown requirements of 11 U.S.C. § 1129(b) and overruling Fannie Mae's objections. This appeal followed.

### III. Fannie Mae's Arguments on Appeal

Fannie Mae has raised several assignments of error in the Bankruptcy Court's decision to confirm the plan. First, Fannie Mae argues that the plan artificially impaired the unsecured claims of Village Green's accountant and attorney. Village Green owed these two creditors only $2,400 and failed to show why it could not simply cash out the claims. Fannie Mae contends that Village Green impaired the claims in order to create a class which would vote to accept the plan

and satisfy the requirements of 11 U.S.C. § 1129(a)(10). As such, the Bankruptcy Court erred by confirming the plan.

Second, Fannie Mae asserts that the plan was not fair and equitable with respect to Fannie Mae's secured claim of $5.4 million in violation of § 1129(b)(1). While the Bankruptcy Court concluded that the plan would provide Fannie Mae with an appropriate interest rate on its secured claim, Fannie Mae argues that the Bankruptcy Court failed to consider what adverse effects the new management agreement would have on existing provisions of the Deed of Trust. More specifically, Fannie Mae claims that the plan strips out its right to approve the property manager and the property management contract. The plan and the new management agreement give Village Green the right to "independently escrow" funds allocated for taxes, insurance, and capital expenditures. Fannie Mae argues that these alterations have improperly shifted the risk of reorganization to Fannie Mae.

Third, Fannie Mae asserts that the plan was not fair and equitable with respect to its unsecured claim. The plan confirmed by the Bankruptcy Court provided the same interest rate on Fannie Mae's secured claim as it did for the unsecured claim, 5.4% per annum. Fannie Mae argues that an unsecured debt carries added risk of nonpayment and accordingly should have an interest rate commensurate with its inherent risk. Fannie Mae adduced opinion testimony before the Bankruptcy Court that an appropriate interest rate for Fannie Mae's unsecured claim would be 22.0%. The Bankruptcy Court concluded that a rate of interest of 22.0% would produce a windfall for Fannie Mae and instead determined that 5.4% was the proper rate for Fannie Mae's unsecured claim. Fannie Mae now contends that the Bankruptcy Court should have undertaken its own present value analysis to arrive at a proper interest rate on the unsecured claim. Therefore, the failure to adjust for the higher risk violates § 1129(b)(1) and the Code's requirement

that the plan be fair and equitable.

Fourth, Fannie Mae makes a related argument that the plan as confirmed violated the absolute priority rule. Specifically, Fannie Mae claims that the plan did not provide Fannie Mae with property equal to the value of its unsecured claim because the interest rate on the unsecured claim was too low. And yet, the plan permitted equity interest holders in Village Green to retain their ownership interests. For the same reasons then that the plan's interest rate on the unsecured claim failed to deal fairly and equitably with Fannie Mae's unsecured claim, the plan's interest rate also violates the absolute priority rule.

Finally, Fannie Mae contends that the Bankruptcy Court erred in holding that the plan met the requirements of § 1129(a)(3) and was proposed in good faith. Fannie Mae argues that the plan effectively disenfranchised Village Green's largest creditor, Fannie Mae, and at the same time artificially impaired the claims of Village Green's "*de minimis*" unsecured creditors. Fannie Mae also claims that Village Green made a number of misrepresentations before the Bankruptcy Court, suggesting that Village Green did not propose the plan fairly and honestly. For example, in multiple schedules and filings with the Bankruptcy Court, Village Green misstated how many unsecured creditors it had (26) even after Village Green had paid all of these creditors and reasonably should have known the debts no longer existed. Fannie Mae further asserts that Clauson gave false testimony before the Bankruptcy Court about Fannie Mae's foreclosure of another apartment complex in the vicinity of Village Green's property and the terms of Village Green's master lease with EP Operator. According to Fannie Mae, Village Green proposed a number of defective plans to the Bankruptcy Court, all of which show that Village Green acted in bad faith. For these reasons Fannie Mae contends that the Court should reverse the decision of the Bankruptcy Court and remand the case for further proceedings.

**STANDARD OF REVIEW**

The standard of review for bankruptcy appeals is clearly erroneous for the Bankruptcy Court's factual findings and *de novo* for its conclusions of law.[1] "Clear error occurs only when [the Court is] left with the definite and firm conviction that a mistake has been committed. If there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[2] If the Bankruptcy Court's conclusion raises a mixed question of law and fact, the district court "must break the question into its constituent parts and apply the appropriate standard of review for each."[3]

**ANALYSIS**

**I. Artificial Impairment**

The first issue presented in this appeal is whether the plan confirmed by the Bankruptcy Court artificially impaired the claims of Village Green's accountant and law firm, what Fannie Mae refers to as the "*de minimis* class." Because Fannie Mae rejected Village Green's plan, the Bankruptcy Court could only confirm the plan through the "cramdown" procedure established by 11 U.S.C. § 1129. One of those requirements is that at least one valid "impaired" class must accept the plan pursuant to § 1129(a)(10). The Code presumes that a class of claims or interests is impaired under a plan unless a specific exception applies.[4] Many courts have found that

---

[1] *Class Five Nev. Claimants v. Dow Corning Corp., (In re Dow Corning Corp.)*, 280 F.3d 648, 656 (6th Cir. 2002).

[2] *Mitan v. Duval (In re Mitan)*, 573 F.3d 237, 241 (6th Cir. 2009) (quotation omitted); Fed. R. Bankr. P. 8013.

[3] *Bank of Montreal v. Official Comm. of Unsecured Creditor* (*In re Am. HomePatient, Inc.)*, 420 F.3d 559, 563 (6th Cir. 2005) (quotation omitted).

[4] 11 U.S.C. § 1124. One exception to the presumption of impairment arises where the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles

"Congress defined impairment in the broadest possible terms."[5]   "[I]mpairment apparently can be of nominal financial significance, since Congress rejected the Commission's recommendation that impairment be deemed to exist only if the class is materially and adversely affected."[6]   In this case, the law firm and the accounting firm, classified as Class 3 under the plan, voted to accept the plan, thereby meeting chapter 11's cramdown requirement.   Fannie Mae argues on appeal that Village Green artificially impaired the claims in Class 3 in an effort to create a vote to confirm the Chapter 11 plan.

The Bankruptcy Court held that the Class 3 claims were "impaired" because under the plan the claims would be paid in two installments at points in time after the effective date of the plan. With respect to Fannie Mae's argument that the plan artificially impaired these creditors, the Bankruptcy Court recognized authority for the proposition that a plan may not artificially impair a class of creditors simply for the purpose of getting that class to accept the plan.   Some courts have held that if a debtor had the capital to "cash out" *de minimis* claims at the time of confirmation, then such claims were not actually "impaired."   The Bankruptcy Court found this line of cases

---

the holder of such claim or interest."   11 U.S.C. § 1124(1); *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 441 n. 14 (1999) ( "Claims are unimpaired if they retain all of their prepetition legal, equitable, and contractual rights against the debtor."); *United States v. Graham* (*In re Monclova Care Ctr., Inc.*), 59 F. App'x 660, 663-64 (6th Cir. 2003).   There is no evidence that this exception would apply in this case, and Fannie Mae has not argued otherwise.

[5] *In re Madison Hotel Assocs.*, 749 F.2d 410, 418 (7th Cir. 1984) (quoting *Taddeo v. Taddeo* (*In re Taddeo*), 685 F.2d 24, 28 (2d Cir. 1982)); *L & J Anaheim Assoc. v. Kawasaki Leasing Int'l, Inc.* (*In re L & J Anaheim Assocs.*), 995 F.2d 940, 942 (9th Cir. 1993); *see also* 7 *Collier on Bankruptcy* ¶ 1124.03, at 1124-27 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

[6] *In re 28th Legislative Dist. Cmty. Dev. Corp.*, 10-14804, 2011 WL 5509140 at *10 (Bankr. E.D. Tenn. Nov. 10, 2011) (quoting 6 *Norton Bankr. L. & Prac.* 3d, § 113:5 (2011) (footnotes omitted)).

unpersuasive. The Bankruptcy Court emphasized that at one time § 1124 provided that a claim was not impaired if a plan provided for cash payment to the creditor in the amount of the allowed claim on the plan's effective date. This "cash out" exception was deleted as part of the 1994 amendments to Code. The Bankruptcy Court noted that the cases recognizing the doctrine of artificial impairment did not squarely address the 1994 amendments. More importantly, the Bankruptcy Court stated that "[c]ases that analyze the 1994 Bankruptcy Reform Act amendments consistently hold that classes that receive payment in full as of the effective date of a plan are now impaired."[7] The Bankruptcy Court further found that "the legislative history indicates that Congress' intent in doing away with § 1124(3) [the cash out exception] was to remove the concept that a creditor receiving payment in full is unimpaired. . . ."[8] Based on this analysis, the Bankruptcy Court concluded that "it is no longer a valid argument to assert that the plan proponent can render a claim unimpaired by paying the claim in full at confirmation."[9]

The Bankruptcy Court went on to note in what is arguably *dicta* that an attorney with the creditor-law firm had testified at the confirmation hearing. In his testimony the attorney explained that the law firm had refused Fannie Mae's offer to purchase its claim because the law firm wanted to thwart "Fannie Mae's attempts to further harm a part of the community that has suffered economically in the last few years."[10]

On appeal Fannie Mae argues that the combined claims of these two creditors totaled less

---

[7] Mem. Op. on Confirmation 15.

[8] *Id.*

[9] *Id.* at 16 (quoting *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 536 (E.D. Tenn. 1997)).

[10] *Id.*

than $2,400 and that "there is no legitimate reason why the Debtor could not have paid the De minimis Claims in full, with interest on the Effective Date."[11]   Fannie Mae also attacks the Bankruptcy Court's reasoning about the 1994 amendments.   According to Fannie Mae, the purpose of the amendments was limited to protect unsecured creditors in solvent chapter 11 cases who were being denied post-petition interest.   Putting aside the deletion of the old "cash out" exception, Fannie Mae focuses on the fact that Village Green had the capital on hand to cash out the Class 3 claims, though Fannie Mae cites no evidence for this assertion.   Therefore, Fannie Mae believes there was no justification for including the *de minimis* claims in the plan at all.

Artificial impairment usually refers to "[t]he manipulation of classes of claims in order to artificially create an accepting class of impaired claims."[12]   In some cases, "artificial impairment" is used to describe a debtor's proposal to separate classes of claims/creditors who otherwise could have been grouped into one class, purely for the purpose of creating an accepting class to support the Chapter 11 plan.   The Sixth Circuit has actually referred to this scenario as "artificial classification" and ruled that it is not permissible under the Code.[13]   In *In re U.S. Truck Co.*, 800

---

[11] Appellants' Br. 21. Fannie Mae cites some of the same authority in support of the doctrine of artificial impairment that the Bankruptcy Court rejected or at least called into question. *Windsor on the River Assocs., Ltd. v. Balcor Real Estate Finan., Inc. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127 (8th Cir. 1993); *In re Dunes Hotel Assocs.*, 188 B.R. 174 (Bankr. D.S.C. 1995).

[12] *In re Griswold Bldg., LLC*, 420 B.R. 666, 707 (Bankr. E.D. Mich. 2009); *see also In re Trenton Ridge Investors, LLC*, 461 B.R. 440, 464-65 (Bankr. S.D. Ohio 2011).

[13] *Boston Post Road Ltd. P'ship v. FDIC (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994); *In re Windsor on the River*, 7 F.3d at 131; *Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props.)*, 961 F.2d 496, 502 (4th Cir. 1992); *In re Swartville, LLC*, No. 11-08676-8-SWH, 2012 WL 3564171, at *3 (Bankr. E.D.N.C. Aug. 17, 2012); *In re Appleridge Reitrement Cmty., Inc.*, 422 B.R. 383, 399 (Bankr. W.D.N.Y. 2010); *In re Torgro Atl. City, LLC*, No. 08-13458, 2009 WL 1288367, at *12 (Bankr. D.N.J. May 7, 2009); *In re Hillside Park Apartments, L.P.*, 205 B.R. 177, 189-90 (Bankr. W.D. Mo. 1997); *In re Bloomingdale Partners*,

F.2d 581 (6th Cir. 1986), the Sixth Circuit observed that the "potential for abuse would be significant" if a debtor's power to "segregate dissenting (impaired) creditors from assenting (impaired) creditors (by putting the dissenters into a class or classes by themselves)" was unchecked.[14] Artificial classification is not at issue in this appeal. Here the Bankruptcy Court engaged in a detailed analysis and determined that the claims of the law firm and accounting firm were properly considered as a class separate and apart from Fannie Mae's claims. Fannie Mae does not challenge the Bankruptcy Court's classification of the *de minimis* claims. Fannie Mae simply argues that the debts owed to the law firm and accounting firm were so relatively minuscule that Village Green should have just paid them out. According to Fannie Mae, instead of cashing the claims out, Village Green proposed a plan to artificially impair these claims only for the purpose of creating an assenting vote for the chapter 11 plan.

Artificial impairment of this kind refers to a scenario where a debtor "deliberately impairs a *de minimis* claim solely for the purpose of achieving a forced confirmation over the objection of a creditor."[15] The leading case criticizing artificial impairment is *Windsor on the River Associates v. Balcor Real Estate Financial*, 7 F.3d 127 (8th Cir. 1993), a decision the Bankruptcy Court called into question in its confirmation order. Many courts have continued to follow *Windsor on the River* and denied confirmation of a chapter 11 plan impairing the *de minimis* claims of some

---

170 B.R. 984, 991-92 (Bankr. N.D. Ill. 1994); *In re Barney & Carey Co.*, 170 B.R. 17, 24 (Bankr. D. Mass. 1994).

[14] *Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d at 586 (6th Cir. 1986). For the reasons explained in this opinion, the Court would emphasize that artificial impairment is analytically distinct from artificial classification.

[15] *In re Swartville, LLC*, 2012 WL 3564171, at *2 (quoting *In re Dunes Hotel Assocs.*, 188 B.R. at 184) (internal quotation marks and brackets omitted)).

creditors for the purpose of contriving a class to accept the plan.[16]  These courts reason that

allowing this kind of manipulation undermines the policy of consensual reorganization expressed

in § 1129(a)(10).[17]  The decisions rejecting the practice of artificial impairment have been

described as "the majority view."[18]

Other courts, including the Ninth Circuit, have concluded that artificial impairment of this

kind does not run afoul of § 1129(a)(10).[19]  Instead these courts have concluded that artificial

impairment is relevant to the issue of the debtor's good faith in proposing such a plan.  Title 11

U.S.C. § 1129(a)(3) requires that the courts confirm only plans "proposed in good faith and not by

---

[16] *In re Combustion Eng'g,* 391 F.3d 190, 243-44 (3d Cir. 2003); *In re All Land Investments, LLC,* 468 B.R. 676, 690 (Bankr. D. Del. 2012); *In re Daly,* 167 B.R. 734, 737 (Bankr. D. Mass. 1994); *In re N. Washington Ctr. Ltd. P'ship,* 165 B.R. 805, 810 (Bankr. D. Md. 1994); *In re Miami Ctr. Assocs., Ltd.,* 144 B.R. 937 (Bankr. S.D. Fla. 1992); *Willows Convalescent Ctrs. Ltd. P'ship v. Unum Life Ins. Co. (In re Willows Convalescent Ctrs. Ltd. P'ship),* 151 B.R. 220 (D. Minn. 1991); *In re Lettick Typografic, Inc.,* 103 B.R. 32, 39 (Bankr. D. Conn. 1989); *In re Club Assocs.,* 107 B.R. 385 (Bankr. N.D. Ga. 1989).

[17] *E.g. Windsor on the River,* 7 F.3d at 131 ("The purpose of [§ 1129(a)(10)] is to provide some indicia of support [for a plan] by affected creditors and prevent confirmation where such support is lacking.").

[18] *In re Crosscreek Apartments, Ltd.,* 213 B.R. at 534-36 (citing Paul Rubin, *Fleeting Hope For Single Asset Real Estate Debtors?,* 16 Am. Bankr. Inst. J. 1 (March 1997)).

[19] *See In re L & J Anaheim Assocs.,* 995 F.2d at 943 (holding that § 1124 does not differentiate between artificial and actual impairment of claims); *Conn. Gen. Life Ins. Co. v. Hotel Assocs. of Tuscon* (*In re Hotel Assocs. of Tucson*), 165 B.R. 470, 475 (9th Cir. BAP 1994); *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 240 (Bankr. D.N.J. 2000) (holding that "under the statutory scheme for the classification and treatment of claims, a plan proponent may impair a class of claims"); *In re Duval Manor Assocs.,* 191 B.R. 622, 628 (Bankr. E.D. Pa. 1996) ("artificial impairment, while perhaps not philosophically the better view, is nevertheless clearly permitted under the plain meaning of the statute"); *In re The Beare Co.,* 177 B.R 886, 889 (Bankr. W.D. Tenn. 1994) (Boswell, B.J.) (following *In re Hotel Assocs. of Tuscon* and *In re L & J Anaheim Assocs.*).

any means forbidden by law."[20]   Thus, rather than treating artificial impairment as an issue that

goes to § 1129(a)(10), the Ninth Circuit has assessed it as a matter of the debtor's good faith.[21]

Whether the issue of artificial impairment goes to § 1129(a)(10) or § 1129(a)(3), many

courts have at the very least required some showing of economic justification for delaying

payment to creditors with *de minimis* claims.[22]   Many of these cases recognize that business

---

[20] 11 U.S.C. § 1129(a)(3).

[21] *In re L & J Anaheim Assocs.*, 995 F.2d at 943 (holding that the court should examine artificial impairment under § 1129(a)(3) and affirming that plan was proposed in good faith); *see also In re Swartville, LLC*, 2012 WL 3564171; *In re The Beare Co.*, 177 B.R at 889.   Two different members of the Bankruptcy Court for the Southern District of New York have actually reached somewhat differing conclusions on the issue presented.   *See In re Quigley Co., Inc.*, 437 B.R. 102, 126 (Bankr. S.D.N.Y. 2010) ("Because the Court concludes that the voting manipulation in this case constituted bad faith under § 1129(a)(3), it does not address whether the same conduct is also prohibited under § 1129(a)(10).") with *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 759 (Bankr. S.D.N.Y. 1995) ("Although this Court does not quarrel with the cases that have analyzed the issue of artificial impairment in the context of 11 U.S.C. § 1129(a)(3), the Court prefers to consider the issue in the context of an analysis of § 1129(a)(10).").

[22] *Poncebank v. Mem'l Prods. Co., Inc. (In re Mem'l Prods. Co., Inc.)*, 212 B.R. 178, 184 (1st Cir. BAP 1997) ("Where the plan contemplates the debtor's continuation in business and the reasonable cash needs of that business—to meet accrued and foreseeable expenses and to make reasonable provision for contingencies—require some or all of the cash on hand that might otherwise be paid to plan creditors on confirmation, that need justifies the plan's deferment of payment to the plan creditors."); *Matter of Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1321 (7th Cir. 1995) (opining that "[a] finding of 'artificial impairment' requires an inquiry into the purposes of the debtor"); *In re All Land Invs., LLC*, 468 B.R. at 690; *In re Greenwood Point, LP*, 445 B.R. 885, 908–909 (Bankr. S.D. Ind. 2011); *Beal Bank, S.S.B. v. Waters Edge L.P.*, 248 B.R. 668, 690–91 (D. Mass. 2000) (concluding 1129(a)(10) is not satisfied unless creditors' rights are "legitimately impaired" for a proper business purpose); *In re Remington Forest*, CIV.A. 95-76069, 1996 WL 33340744 (Bankr. D.S.C. June 18, 1996); *In re Ridgewood Apartments of DeKalb Cnty., Ltd.*, 183 B.R. 784, 789 (Bankr. S.D. Ohio 1995) ("If plan proponents have valid, credible reasons for impairing a class of claims, another class cannot argue that it has been deprived of veto power over a plan."); *In re Gramercy Twins Assocs.*, 187 B.R. 112, 118 (Bankr. S.D.N.Y. 1995) (addressing claim of artificial impairment and confirming plan in part because the debtor did not have the ability to pay the full debt); *In re Fur Creations By Varriale, Ltd.*, 188 B.R. at 759–761 ("There must be a showing that the proposed impairment is necessary for economical or other justifiable reasons and not just to achieve 'cram down.'"); *In re W.C. Peeler Co., Inc.*, 182 B.R. 435, 436 (Bankr. D.S.C. 1995); *In re 203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 593 (Bankr.

debtors going through reorganization need what capital they have for ongoing expenses. Therefore, the debtor must make some showing that it does not have sufficient capital to cash out *de minimis* claims, thereby demonstrating that the claims are actually, as opposed to artificially, impaired.

Based on this significant body of legal authority, the Court holds that the Bankruptcy Court erred as a matter of law by rejecting the doctrine of artificial impairment outright. The Bankruptcy Court correctly held that the *de minimis* claims were impaired. However, the issue presented is not whether the claims were impaired, as the Code defines the term, but whether Village Green impaired the claims without justification. It is clear that even after the 1994 amendments, the majority view continues to be that artificial impairment runs afoul of the requirements for Chapter 11 confirmation. Therefore, the Bankruptcy Court's ruling on this issue must be reversed.

Some question remains about whether artificial impairment is more properly considered as part of the § 1129(a)(10) analysis or as part of the good faith analysis under § 1129(a)(3). Like most Circuits, the Sixth Circuit has not addressed the kind of artificial impairment raised by Fannie Mae in this appeal.[23] The Bankruptcy Court did not reach that question because it concluded that

---

N.D. Ill. 1995) (finding that the debtor "had to impair claims" and proposed the plan in good faith where "[t]he debtor's operations are not anticipated to generate sufficient income to pay all unsecured claims in full, with interest"); *rev'd on other grounds sub nom. Bank of Am. Nat. Trust & Sav. Ass'n, v. 203 N. LaSalle St. P'ship*, 526 U.S. 434 (1999); *In re Investors Fla. Aggressive Growth Fund, Ltd.,* 168 B.R. 760, 766–767 (Bankr. N.D. Fla. 1994); *see also* §10.80 Impairment or Nonimpairment, *Advanced Ch. Eleven Bankr. Prac.* (Thomas J. Salerno et al. eds., 2012) ("Thus, for example, a debtor should not be permitted to slightly impair, without business justification, a friendly, fully secured creditor to create an impaired accepting class, when all classes otherwise impaired have rejected the plan.").

[23] *E.g. in re Quigley Co., Inc.*, 437 B.R. at 126 (stating that the Second Circuit had not addressed whether artificial impairment should be addressed as part of the analysis under §

artificial impairment was no longer a viable legal theory. Therefore, on remand the Bankruptcy Court should consider in the first instance whether artificial impairment is relevant to its analysis under § 1129(a)(10) or the analysis under § 1129(a)(3). Furthermore, the Court holds that under either code section Village Green must demonstrate some economic justification for delaying payment to the *de minimis* creditors. On remand, the Bankruptcy Court should make the determination in the first instance of whether Village Green has shown good cause for the impairment of the claims of its accountant and attorney. Therefore, the decision of the Bankruptcy Court on the issue of artificial impairment is **REVERSED** and **REMANDED** for further proceedings consistent with this opinion.

## II. Plan Modifications to the Loan Agreement

The second issue presented in this appeal is whether the plan confirmed by the Bankruptcy Court was fair and equitable to Fannie Mae with respect to its secured claim. The Code allows confirmation of a plan over the objection of a class of secured claims so long as the plan is "fair and equitable" to the claims.[24] Section 1129(b)(2)(A) establishes the standard for fair and equitable

---

1129(a)(10) or § 1129(a)(3)). The Fourth and Seventh Circuit have recognized the issue but then declined to reach it under the facts presented. *In re Schwarzmann*, 103 F.3d 120, at *3 (4th Cir. 1996) (unpublished table decision) ("We need not decide whether the vote of an artificially impaired class to accept a plan counts under § 1129(a)(10) because the impairment to CDC's claim is not artificial or insignificant."); *Matter of Wabash Valley Power Ass'n, Inc.*, 72 F.3d at 1321 ("A finding of 'artificial impairment' requires an inquiry into the purposes of the debtor which is not appropriately undertaken by a reviewing court when the creditor pressing the argument has failed to develop a record on the issue which we might review."). *See also In re Vill. at Camp Bowie I, L.P.*, 454 B.R. 702, 710-11 (Bankr. N.D. Tex. 2011) (citing *In re Sun Country Dev. Corp.,* 764 F.2d 406, 408 (5th Cir. 1985) and predicting that the Fifth Circuit would not deny confirmation based on artificial impairment).

[24] 11 U.S.C. § 1129(b)(1) & (2).

treatment and sets forth three separate legal tests by which a plan can satisfy the standard.[25]   One

of these tests requires that the holder of a secured claim retain its lien "to the extent of the allowed

amount of such claims" and that the holder receive "deferred cash payments totaling at least the

allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of

such holder's interest in the estate's interest in such property."[26]   The Bankruptcy Court held that

the plan treated Fannie Mae's secured claim fairly and equitably.   More specifically, the

Bankruptcy Court concluded that the plan met the requirements of § 1129(b)(2)(A)(i) because

under the plan Fannie Mae retained its lien and received an appropriate interest rate to give Fannie

Mae the allowed amount of its secured claim.   The Bankruptcy Court received testimony from

each party's expert about the proper interest rate for Fannie Mae's secured claim. After an

extensive analysis of the issue, the Bankruptcy Court confirmed the plan's provision for an interest

---

[25]   § 1129(b)(2)(A).   The Code specifically states that a plan must satisfy the fair and
equitable requirement by making one of the following provisions for secured claims:

> (i)(I) that the holders of such claims retain the liens securing such claims, whether the
> property subject to such liens is retained by the debtor or transferred to another entity, to
> the extent of the allowed amount of such claims; and
> (II) that each holder of a claim of such class receive on account of such claim
> deferred cash payments totaling at least the allowed amount of such claim, of a value,
> as of the effective date of the plan, of at least the value of such holder's interest in the
> estate's interest in such property;
> (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to
> the liens securing such claims, free and clear of such liens, with such liens to attach to
> the proceeds of such sale, and the treatment of such liens on proceeds under clause (i)
> or (iii) of this subparagraph; or
> (iii) for the realization by such holders of the indubitable equivalent of such claims.

Because Fannie Mae's appeal is not based on any of these technical requirements, the Court does
not address them here.

[26]   § 1129(b)(2)(A)(i).

rate of 5.4% on Fannie Mae's secured claim.[27]

On appeal Fannie Mae does not object to the Bankruptcy Court's conclusion that an interest rate of 5.4% was sufficient or argue that the plan failed to conform to any of the technical requirements of § 1129(b)(2)(A).   Fannie Mae contends that the Bankruptcy Court only addressed the arithmetic requirements of the fair and equitable standard and failed to consider how the plan's modifications to the loan documents improperly shifted risk to Fannie Mae.   For example, under the plan, Village Green no longer makes tax, insurance, and capital reserve payments to Fannie Mae but independently escrows those funds and makes quarterly reports to Fannie Mae.   In other ways, the plan grants Village Green greater discretion over the management of the property such as the power to act unilaterally to change property managers or alter the property management contract itself without prior approval from Fannie Mae.   Fannie Mae argues that these modifications of the loan documents have increased the risk of loss and shifted the increased risk to Fannie Mae in violation of the fair and equitable standard.

As a threshold question, Fannie Mae asserts that the Bankruptcy Court failed to address its argument on this issue at all in the proceedings below.   Fannie Mae argued before the Bankruptcy Court that the modifications to the loan agreement rendered the plan unfair and inequitable and that Village Green proposed the changes in bad faith.   The Bankruptcy Court clearly addressed some terms of the plan's new property management agreement but only in the course of its analysis of whether Village Green had proposed the plan in good faith pursuant to § 1129(a)(3). Specifically, the Bankruptcy Court found that Village Green had acted in good faith by proposing to eliminate Fannie Mae's control over escrow accounts for tax and insurance payments while at

---

[27] Mem. Op. on Confirmation 27-33.

the same time proposing to provide Fannie Mae with quarterly reports about the accounts.[28]   The

full text of the Bankruptcy Court's analysis of good faith requirement reads as follows:

> It is not surprising, given the parties' postures throughout the case, that the Debtor
> would want to make tax and insurance payments directly.   The Debtor presented
> evidence to show that it will produce quarterly reports to Fannie Mae,
> post-confirmation, and the Debtor alleges that Fannie Mae was never a direct party
> to the management agreement.   Fannie Mae has not shown the Court evidence to
> the contrary.   The Court does not find the terms of the property management
> agreement so sacred that they cannot be modified, such as Fannie Mae's lien rights
> would be pursuant to 1129(b)(2)(A)(i)(I).[29]

It is not clear that the Bankruptcy Court addressed Fannie Mae's argument that the plan was not

fair and equitable pursuant to § 1129(b)(2)(A), even though Fannie Mae had raised the issue in its

briefing for the Bankruptcy Court.[30]   Despite its passing reference to § 1129(b)(2)(A)(i)(I), it does

not appear that the Bankruptcy Court squarely addressed Fannie's argument about the fairness and

equity of the plan's modifications of the loan documents.   Therefore, the Court holds that remand

is necessary so that the Bankruptcy Court can address the issue more fully in the first instance.

### III.   Interest Rate for Fannie Mae's Unsecured Claim

The next issue presented in this appeal is whether the plan confirmed by the Bankruptcy

Court was fair and equitable to Fannie Mae with respect to its unsecured claim.   Just as with

secured claims, a plan must afford fair and equitable treatment for any unsecured claim.[31]   Section

1129(b)(2)(B) requires a plan to provide that each holder of an unsecured claim receive or retain

---

[28] *Id.* at 12-13.

[29] *Id.* at 13.

[30] Fannie Mae's Post-Trial Br. in Opp'n to Confirmation of Debtor's Fifth Am. Plan of
Reorganization 30-36, R. 698-742, Tab. 21.   Fannie Mae's briefing on this issue for the
Bankruptcy Court is largely identical to its briefing of the issue in this appeal.

[31] 11 U.S.C. § 1129(b)(1) & (2).

property of a value, as of the effective date of the plan, equal to the allowed amount of the claim; or

that the holders of any junior claim or interest will not receive or retain any property on account of

their claim or interest.[32]   The Bankruptcy Court found that under current market conditions an

interest rate of 5.4% would be appropriate on the unsecured portion of Fannie Mae's non-recourse

loan.   Fannie Mae's opinion witness testified that a proper interest rate on the unsecured claim

would be 22% per annum.   The Bankruptcy Court gave little weight to that opinion in part

because it found that Fannie Mae's witness overstated the likelihood of default in this case.   The

Bankruptcy Court further noted that Fannie Mae was not advancing new funds but that the parties

were attempting a workout of the original loan, which had an interest rate of 5.98%.   And yet the

Bankruptcy Court found that current market conditions were quite different than the conditions

prevailing at the time the parties entered into the original loan.   For instance, Village Green's

opinion witness testified that the prime rate is no longer a starting point for calculating loans in

today's market because prime is simply too high.   The Bankruptcy Court also found that the

property was now worth roughly half ($5.4 million) of the price which Village Green paid in 2005

($10.82 million).   After allowing for the fact that the 5.4% rate on Fannie Mae's secured claim

was perhaps "higher than it should have otherwise been," the Bankruptcy Court determined that

the 5.4% interest for the unsecured claim properly accounted for any additional risk associated

with the unsecured claim.

Fannie Mae contends on appeal that the Bankruptcy Court erred.   Fannie Mae argues that

the Bankruptcy Court should have begun with the prime rate and then adjusted the rate upward to

account for the risk of nonpayment by considering factors such as the circumstances of the estate,

---

[32]   § 1129(b)(2)(B).

the nature of the security, and the duration and feasibility of the reorganization plan. Fannie Mae emphasizes that unsecured claims carry a greater risk of nonpayment than secured claims. Thus, according to Fannie Mae, "[i]f 5.4% is the appropriate rate for the Secured Claim, it is necessarily not the appropriate rate for the Unsecured Claim."[33] Moreover, Fannie Mae argues that none of the factors discussed by the Bankruptcy Court support its conclusion that the same 5.4% rate is proper for both the secured claim and the unsecured claim.

The standard of review for the Bankruptcy Court's "determination of the appropriate interest rate is reviewed for clear error."[34] In other words, this Court must be "left with the definite and firm conviction that a mistake has been committed."[35] Under this highly deferential standard, the Court cannot say that an interest rate of 5.4% was clearly erroneous. The Bankruptcy Court engaged in a careful analysis of the relevant case law and applied it to the facts as it had found them in this case.[36] The confirmation order set out the factors the Bankruptcy Court found most relevant under the circumstances, particularly its finding that there was not a high risk of nonpayment as to the unsecured claim and that the market conditions had changed significantly. Moreover, the Bankruptcy Court rejected the testimony of Fannie Mae's opinion witness that an appropriate rate would be 22% per annum.[37] Even though another factfinder might have reached

---

[33] Appellants' Br. 21.

[34] *Gen. Elec. Credit Equities, Inc. v. Brice Rd. Devs., L.L.C. (In re Brice Rd. Devs., L.L.C.*, 392 B.R. 274, 280 (B.A.P. 6th Cir. 2008) (citations omitted).

[35] *In re Mitan*, 573 F.3d at 241.

[36] Mem. Op. on Confirmation 29 (citing *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) and *In re Am. HomePatient, Inc.*, 420 F.3d 559 (6th Cir. 2005)).

[37] *In re Brice Rd. Devs., L.L.C.*, 392 B.R. at 280 ("It is [the creditor]'s burden to demonstrate that a higher rate than that proposed by the Debtor is appropriate.").

a different result based on what are perhaps "two permissible views of the evidence," the Bankruptcy Court's "choice between [the two views] cannot be clearly erroneous."[38]   Therefore, the decision of the Bankruptcy Court is **AFFIRMED** as to this issue.

## IV.   Absolute Priority Rule

The next issue presented in this appeal is whether the plan's treatment of Fannie Mae's unsecured claim violated the absolute priority rule.   Like § 1129(b)(2)(B), the absolute priority rule requires that "the allowed value of the claims held by that class is to be paid in full, or the holder of any claim junior to the claims of such class will not receive or retain under the plan on account of such junior claim any property."[39]   In fact, the Sixth Circuit has described § 1129(b)(2)(B) as the codification of the absolute priority rule.[40]   As the Bankruptcy Court stated in its confirmation order, "A cramdown may proceed only if the objective class of creditors is paid full present value."[41]   The Bankruptcy Court concluded that the plan did not violate the absolute priority rule because Fannie Mae's secured and unsecured claims would receive an appropriate interest rate.   On appeal, Fannie Mae contends that the plan's interest rate of 5.4% on its unsecured claim violates the absolute priority rule for the same reasons that it violates § 1129(b)(2)(B)'s fair and equitable standard.

Just as the Court concluded that the 5.4% interest rate on Fannie Mae's unsecured claim

---

[38] *In re Mitan*, 573 F.3d at 241.

[39] *In re Dow Corning Corp.*, 456 F.3d at 678 (internal quotation marks omitted) (quoting *203 N. LaSalle St. P'ship,* 526 U.S. at 441-42 (1999)).

[40] *Id.*

[41] Mem. Op. on Confirmation 36 (quoting *In re Am. HomePatient*, 298 B.R. 152, 188 (Bankr. M.D. Tenn. 2003)).

satisfied § 1129(b)(2)(B)'s fair and equitable standard, the Court holds that the interest rate does not violate the absolute priority rule.    Therefore, the ruling of the Bankruptcy Court is **AFFIRMED** on this issue.

## V.    Whether Village Green Proposed the Plan in Good Faith

The final assignment of error raised in this appeal is Fannie Mae's contention that Village Green did not propose the plan in good faith.    Pursuant to 11 U.S.C. § 1129(a)(3), a court may confirm a plan only if "the plan has been proposed in good faith and not by any means forbidden by law."[42]    Courts have held that in the context of chapter 11, "good faith" means that the plan will likely achieve a result consistent with the objectives and purposes of the Code.[43]    "In assessing whether a plan complies with § 1129(a)(3)'s good faith standard, a bankruptcy court must examine the totality of the circumstances."[44]    The good faith determination "is essentially a factual inquiry and will only be reversed if clearly erroneous."[45]    The Bankruptcy Court concluded that the plan satisfied the good faith requirements, holding that Village Green had not acted in bad faith or attempted to mislead the Bankruptcy Court by proposing a number of different plans and filing multiple schedules.

On appeal Fannie Mae raises the following examples of Village Green's bad faith in this matter: (1) the plan artificially impairs a *de minimis* class of claim "while the Debtor's only

---

[42] 11 U.S.C. § 1129(a)(3).

[43] *In re Trenton Ridge Investors, LLC*, 461 B.R. at 468 (citing *In re Madison Hotel Assocs.*, 749 F.2d at 725) (other citations omitted) .

[44] *Id.* (citations omitted).

[45] *Tenn-Fla Partners v. First Union Nat. Bank of Fla.*, 229 B.R. 720, 734 (W.D. Tenn. 1999) (citing *Soc'y Nat'l Bank v. Barrett (In re Barrett)*, 964 F.2d 588, 591 (6th Cir. 1992)).

legitimate creditor is subject to significant undue risk;"[46] (2) Village Green made several misrepresentations in its filings with the Bankruptcy Court about its unsecured creditors and its triple net agreement for the collection of rents at the property; (3) Clauson, Village Green's representative, misrepresented to the Bankruptcy Court Fannie Mae's post-foreclosure management of another property in the Hickory Hill area; and (4) Village Green proposed a series of unconfirmable plans, which forced Fannie Mae to file two different motions for summary judgment before Village Green corrected the plans.

The Court holds that the Bankruptcy Court's determination of the good faith issue was not clearly erroneous. The Bankruptcy Court was obviously better situated to evaluate each party's conduct throughout the course of the proceedings below and make findings about Village Green's good faith. The Bankruptcy Court addressed Fannie Mae's contentions about Village Green's actions and set forth in some detail its findings about Village Green's multiple filings and alleged misrepresentations. The Bankruptcy Court found that in the final analysis Village Green had proposed the plan and otherwise acted in good faith during the proceedings. Under the circumstances the Court is not "left with the definite and firm conviction that a mistake has been committed."[47]

As previously discussed herein, the Bankruptcy Court should consider on remand whether the issue of artificial impairment is relevant to the good faith analysis required by § 1129(a)(3). In the event that the Bankruptcy Court determines that artificial impairment is a good faith inquiry under § 1129(a)(3), the Bankruptcy Court should go on to decide what good faith basis existed for

---

[46] Appellant's Br. 41.

[47] *In re Mitan*, 573 F.3d at 241.

Village Green to artificially impair the *de minimis* claims of its accountant and attorneys. Otherwise, the decision of the Bankruptcy Court is **AFFIRMED** on this issue.

Therefore, the decision of the Bankruptcy Court is **AFFIRMED IN PART** and **REVERSED AND REMANDED IN PART** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: December 5, 2012.